IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KIMBERLY S. RIGGS,                                                     CV 05-6292-AS

        Plaintiff,                                           FINDINGS AND
                                                         RECOMMENDATION
    v.

JO ANNE B. BARNHART, Commissioner of Social
Security,

        Defendant.

ASHMANSKAS, Magistrate Judge:

## INTRODUCTION

Plaintiff Kimberly Riggs brings this action for judicial review of a final decision of the Commissioner of Social Security denying her applications for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act. The court has jurisdiction under 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's decision should be affirmed and the case dismissed.

/ / / / /

## BACKGROUND

1 - FINDINGS AND RECOMMENDATION

Riggs was born October 10, 1955. Tr. 78.[1] She earned a GED after leaving high school in the ninth grade. Tr. 172. Riggs has past work experience as a quality control food processor, assembler and sorter, tester and sorter, etcher, and caregiver, Tr. 1075-1076. Riggs asserts disability from August 1, 1997, based on a combination of conditions including diabetes, asthma, fibromyalgia, anxiety, panic disorder, depression, obesity, irritable bowel syndrome, gastroesophageal reflux disease (GERD), and hypertension. She satisfied the insured status requirements for DIB benefits under Title II through March 31, 2002. Tr. 17. Riggs applied for DIB and SSI on November 29, 2001. Her applications were denied and an administrative hearing was held before an Administrative Law Judge (ALJ) on June 15, 2004. The ALJ issued an opinion on August 25, 2004, finding Riggs not disabled which is the final decision of the Commissioner.

## **DISABILITY ANALYSIS**

The initial burden of proof rests upon the claimant to establish disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner has established a sequential process of up to five steps for determining whether a person over the age of 18 is disabled within the meaning of the Act. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920. At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments.

---

[1] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed with the Commissioner's Answer.

An impairment is severe if it significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. §§ 404.1521, 416.921. An impairment can be found "not severe" only if it is a minor abnormality that has no more than minimal effect on the claimant's ability to work. *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). The inquiry at step two is "a *de minimis* screening device to dispose of groundless claims." *Id.* The burden to show a medically determinable severe impairment is on the claimant. *Bowen v. Yuckert*, 482 U.S. at 146. Although the ALJ found Riggs has medically severe impairments, she challenges the ALJ's determination that she did not have other severe impairments.

If the adjudication proceeds beyond step three, the Commissioner must assess the claimant's residual functional capacity (RFC). The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by her impairments. 20 C.F.R. §§ 404.1545, 416.945; Social Security Ruling (SSR) 96-8p. Riggs challenges the ALJ's determination of her RFC. At step four, the Commissioner must determine whether the claimant retains the RFC to perform work she has done in the past. If the ALJ determines that she retains the ability to perform her past work, the Commissioner will find the claimant not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f). Riggs challenges the ALJ's finding that she was able to perform her past work.[2]

## THE ALJ's FINDINGS

---

[2]In step five, the Commissioner must establish that the claimant can perform other work. 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). If the Commissioner meets this burden and proves that the claimant is able to perform other work which exists in the national economy, the claimant is not disabled. 20 C.F.R. §§ 404.1566, 416.966.

3 - FINDINGS AND RECOMMENDATION

The ALJ found that Riggs has medically determinable impairments that significantly limit her ability to perform basic work activities. He determined she had severe impairments of degenerative joint disease of the left knee, a personality disorder, and a history of substance abuse. Tr. 18.

After determining that Riggs' conditions did not meet or equal an impairment listed in 20 C.F.R. pt. 404, subpt. P, app.1, the ALJ assessed her RFC. He determined Riggs could work at a light exertional level with non-exertional limitations of simple, one to three step work and only occasional public contact. Tr. 25. The ALJ asked the impartial vocational expert (VE) testifying at the hearing to evaluate whether a person with this RFC could perform Riggs' past relevant work. The VE testified she could return to her job of quality control food processing, assembler and sorter, and tester and sorter. Tr. 1076-1077. The ALJ determined Riggs could perform her past relevant work and was not disabled within the meaning of the Social Security Act. Tr. 25.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

The ALJ is responsible for "determining credibility, resolving conflicts in the medical testimony and resolving ambiguities." *Edlund v. Massanari,* 253 F.3d 1152, 1156 (9th Cir. 2001). The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F.2d 771,772 (9th Cir. 1986). If the evidence can reasonably

support either affirming or reversing the Commissioner's conclusion, the court may not substitute its judgment for that of the Commissioner. *Batson v. Commissioner of Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). The Commissioner's decision must be upheld, even if the "evidence is susceptible to more than one rational interpretation." *Andrews v. Shalala*, 53 F.3d at 1039-1040.

## DISCUSSION

Riggs asserts that the ALJ erred by failing to find her fibromyalgia, depression, and obesity were impairments. She also asserts the ALJ did not properly evaluate the lay witness testimony and her credibility. The court has carefully reviewed the extensive medical records, and the parties are familiar with the records. Accordingly, only the relevant details of those medical records will be recounted here.

**I.    Impairments**

   **A.  Fibromyalgia**

Riggs asserts the ALJ erred by not finding her fibromyalgia a severe impairment or an impairment at step two and not properly considering fibromyalgia in the development of her RFC. Riggs specifically argues the ALJ improperly relied on the opinion of Dr. Morrell, a state agency examining consultant, and disregarded the opinions of treating specialists at Oregon Health Sciences University (OHSU) and her treating physicians.

The medical records begin in 1994 and note Riggs has a history of fibromyalgia. However, the original diagnosis of fibromyalgia, which Riggs reports was made in 1985, is not in the record. Tr. 715. The record indicates periods when her fibromyalgia symptoms were "quiescent" or exacerbated. Tr. 242, 276, 313, 427. Riggs was treated by several medical professionals including some through the Grand Ronde Tribal Health Clinics. She sought treatment for elevated blood

5 - FINDINGS AND RECOMMENDATION

pressure in June 1999, following a hike to Bagby Hot Springs, but the clinical notes do not mention fibromyalgia. Tr. 422. Riggs also sought medical treatment for back pain in August 1999, after picking berries. The clinical notes state "she says she has fibromyalgia" and she was treated for low back pain with sciatica. Tr. 427. The record also indicates Riggs had symptoms inconsistent with fibromyalgia. She was treated at Valley Community Hospital in December of 1999, and it was noted that although she had a history of fibromyalgia, she had no trigger point[3] tenderness. Tr. 648. Dr. James, a treating physician in 2002, noted her past history of fibromyalgia but recounted the following inconsistency, "stating in marked pain, but moving about quite comfortably and when she gets up to leave, her gait is quite normal, moving in a normal fashion without pain to observation." Tr. 867.

Riggs began treatment with Dr. Michaels at Firehouse Diabetes and Endocrine Clinic and he diagnosed Adult Growth Hormone Deficiency (AGHD) in June, 2001. Tr. 551-553, 614. Clinical notes indicate AGHD has similar symptoms to fibromyalgia, and there could be an "overlap." Tr. 557. Dr. Michaels' notes from 2002 indicate Riggs was "feeling much better," had decreased muscle and joint pain, and had increased her activity after starting growth hormone treatment. Tr. 564, 568. Riggs was examined at OHSU by Dr. Bordana in June 2001, who noted she reported a previous diagnosis of fibromyalgia. Tr. 716. He suggested she might have early

---

[3]"Fibromyalgia's cause is unknown, there is no cure, and it is poorly understood within much of the medical community. The disease is diagnosed entirely on the basis of patients' reports of pain and other symptoms. The American College of Rheumatology issued a set of agreed-upon diagnostic criteria in 1990, but to date there are no laboratory tests to confirm the diagnosis." *Benecke v Barnhart*, 379 F.3d 587, 590 (9th Cir. 2004) (citations omitted). The American College of Rheumatology has determined there are 18 designated sites on the body called tender or trigger points that are used to diagnose fibromyalgia. A diagnosis requires pain upon application of four kilograms of pressure to at least 11 of the 18 sites. Fibromyalgia Research Association, www. nfra.net/Diagnost.htm. Last viewed December 18, 2006.

onset rheumatoid arthritis and referred her to the Rheumatology Clinic at OHSU. Tr. 725. Drs. Daoud and Barkhuizen at the OHSU Rheumatology Clinic examined Riggs in February 2002, and noted she had 18 of 18 tender points consistent with fibromyalgia. They also noted her upcoming treatment for her growth hormone deficiency "may also improve her fibromyalgia symptoms." Tr. 501. Riggs received steroid injections into trigger points from a nurse practitioner at the OHSU Clinic in the summer of 2002. Tr. 690-691, 694-695, 699-701. Drs. Daoud and Barkhuizen stated the "most important thing" for her was to be active and referred her to physical therapy. Tr. 501. However, Riggs was discharged from OHSU physical therapy in March 2003, for failure to make and follow up with appointments. Tr. 685-688. Dr. Morrell, a state agency consultant, examined Riggs in March 2002 and found "she does not have fibromyalgia by my examination, as both the control points and trigger points are positive. . . Findings are most consistent with pain related to her depression." Tr. 508.

The ALJ noted Riggs had reported a diagnosis of fibromyalgia from 1985 and "this diagnosis has been routinely quoted." Tr. 18. Although Riggs' examinations at OHSU revealed response on eighteen of eighteen trigger points, the ALJ noted the report made no mention of control points. In discussing Riggs' conditions and Dr. Morrell's examination he stated,

> While alleging significant pain, she was able to get on and off the exam table and take her shoes off without any trouble; gait and coordination were normal; straight leg raise was negative; range of motion was normal, except in the shoulders; there were no paravertebral muscle spasms, there was no joint crepitus, effusion, or deformity; there were no rheumatoid nodules or gouty tophi; motor strength was 5 of 5; and muscle bulk and tone were normal. Despite these factors, the physician describes extreme tenderness everywhere he touched, with both control and trigger points being positive. Dr. Morrell notes that this negates any diagnosis of fibromyalgia. This assessment is supported by the reduced mention of fibromyalgia in the treatment record.

>Other impairments are also not severe. The record shows hypertension and asthma to be well controlled with none of the complications associated with these conditions, and diabetes is once again diet controlled and without complications.

Tr. 18.

The ALJ opined many of her conditions, including fibromyalgia, diabetes, asthma, hypertension, gastroenteritis, gastroesophageal reflux disease, stress incontinence and carpal tunnel syndrome were either resolved, not symptomatic, or never existed. Tr. 18. Whether or not the ALJ specifically found the diagnosis of fibromyalgia supported by the record, he made the determination of the severity of her physical condition based on the degree to which her functioning was limited. This determination is supported by the record. A diagnosis without significant functional limitations does not compel a finding of "severe" impairment. The claimant bears the burden of proving that her impairment is severe. 20 C.F.R. §§ 404.1512, 416.912; *Mayes v. Massanari,* 276 F.3d 453, 459 (9th Cir. 2001). An impairment is not severe if it does not significantly limit the physical ability to do basic work activities, such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling. 20 C.F.R. §§ 404.1521, 416.921. The mere fact that a condition has been acknowledged with a medical diagnosis does not in itself equate to a finding of disability. *See, Key v. Heckler,* 754 F.2d 1545, 1549-1050 (9th Cir. 1985); *Young v. Sullivan,* 911 F.2d 180, 183-184 (9th Cir. 1990).

Riggs' treating physicians did not limit her ability to work. Dr. Alsever, a treating physician in 1996, encouraged her to seek more "sedentary type" jobs following problems with hernias. Tr. 316. In January 2000, Riggs complained to her treating physician, Dr. Molloy, that the surgeon who repaired her abdominal hernia released her back to regular work and she desired a second opinion. Tr. 435. She received a second opinion from Dr. Rios who stated she needed to wear a binder and

not lift more than fifteen pounds. Tr. 666. In June 2002, Dr. James, her treating physician, noted Riggs asked for a letter describing her disability and was angry at him for the insufficiency of the letter. Tr. 867. He discussed sending an earlier letter written by the nurse practitioner which stated Riggs was not able to participate in a job search due to her conditions. *Id.,* Tr. 970. Although there are no statements from physicians in the medical record attesting to her inability to work due to her fibromyalgia symptoms, there are statements made by Riggs to her medical providers alleging inability to work. Tr. 435, 555, 699. As discussed further below, the ALJ did not find Riggs fully credible regarding her assertions of pain symptoms. Riggs was also able to engage in activities such as hiking, walking at the state fair, and berry picking. Tr. 422, 427, 689. Riggs was treated for back pain in October 2000, caused by "carrying four two-liter bottles of Coke" at once. Tr. 447. The clinical notes state she was able to ambulate and perform activities of daily living although the lumbar strain caused some pain when she did so. *Id.*

     The ALJ did not find Riggs had a severe impairment of fibromyalgia, however, he found she had other severe impairments at step two and proceeded with the sequential evaluation. The ALJ discussed the medical evidence and properly evaluated the functional limitations imposed by her conditions. Even assuming the ALJ did not correctly call fibromyalgia an impairment, it did not affect his evaluation of her functional limitations and would be harmless error. *See, Batson v. Commissioner of Soc. Sec. Admin.*, 359 F.3d at 1197. The ALJ's determination of Riggs' functional limitations is reflected in her RFC of light work and is supported by substantial medical evidence in the record.

/ / / / /

/ / / / /

### B. Depression

Riggs asserts the ALJ erred in failing to find her depression an impairment. Although the medical record is replete with references to depression, none of the examining or treating psychiatrists or psychologists diagnosed depression. Riggs' treating physician, Dr. Foster, prescribed Prozac for depression in March 1996. In January 2000, Dr. Molloy noted Riggs recounted a history of depression. Tr. 435. Dr. Suckow conducted psychiatric assessments of Riggs for medication monitoring in March and April 2000. He diagnosed anxiety disorder, with Global Assessments of Functioning (GAF) of 50 and 60,[4] and prescribed Prozac. Tr. 334-340. Dr. Molloy referred Riggs to a psychiatrist, Dr. Belleville, in February 2002. Dr. Belleville diagnosed adjustment disorder with anxiety secondary to medical illness with a GAF of 50, with the highest GAF of the year at 54. He recommended a change in her medications Tr. 753-754. Riggs was examined by Dr. Wolf, a state agency consultant, in March 2002. Dr. Wolf diagnosed cannabis dependence and generalized anxiety order. He noted Riggs stated she used marijuana to help with her fibromyalgia, but the marijuana use could be increasing her anxiety. Dr. Wolf also noted "she does have a significant amount of anxiety, which may be due to a generalized anxiety disorder but also may have a contribution from her personality." Tr. 513.

---

[4]The GAF is a scale from 1-100, in ten point increments, that is used by clinicians to determine the individual's overall functioning. A GAF of 41 to 50 indicates serious symptoms (suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job). A GAF of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)
The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. 2000).

Dr. Henry, a state agency non-examining consultant, diagnosed anxiety-related disorder with moderate limitations in activities of daily living, social functioning, and maintaining concentration, persistence or pace. He also noted Riggs failed to follow through with treatment for emotional complaints and her use of marijuana raised compliance issues. Dr. Henry stated Riggs was capable of simple tasks, needed short and simple directions, and should avoid hazardous work settings. He noted her limitations in concentration were likely the result of anxiety, multiple medications, and use of cannabis. Tr. 515-535.

Dr. Hennings, a state agency non-examining consultant, completed an MRFC in December, 2002. He noted depression, anxiety, personality disorder, and cannabis dependence. Dr. Hennings also found only moderate limitations in activities of daily living, social functioning, and maintaining concentration, persistence and pace. Tr. 619-634. Dr. Sacks, a psychologist, testified as a medical expert at the administrative hearing in June 2004. Tr. 1071-1074. He diagnosed a personality disorder and cannabis dependence, with moderate limitations only in social functioning. Tr. 1072-1073. Dr. Sacks testified the medical record had numerous references to mild depression, anxiety, and panic attacks. He noted Dr. Wolf was the only psychologist to specifically examine these complaints and Dr. Wolf found no evidence for panic attacks. Dr. Sacks testified further that Riggs' symptoms fit more accurately under the diagnosis of personality disorder rather than anxiety or depressive disorder. He agreed with Dr. Wolf that long term cannabis use could aggravate her anxiety and affect her emotions. Tr. 1073.

The ALJ adopted the opinion of the testifying medical expert that Riggs had a personality disorder resulting in only mild and moderate restrictions. This diagnosis is not inconsistent with those of the examining and treating psychologists and psychiatrists. Drs. Suckow, Belleville, and

11 - FINDINGS AND RECOMMENDATION

Wolf examined Riggs and did not diagnose depression. Although Dr. Hennings, a non-examining state agency consultant, noted depression, he found only mild and moderate limitations in functioning. The opinion of a non-examining physician by itself does not constitute substantial evidence to reject the opinion of a treating or examining physician. *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995). As discussed above, a diagnosis is important in the development of an RFC when there are associated functional limitations. The ALJ limited Riggs to simple, routine work with only occasional public contact. The ALJ's RFC assessment is supported by substantial evidence in the record.

### C. Obesity

Riggs asserts the ALJ erred by failing to find obesity an impairment. The medical record notes obesity as on ongoing condition. Riggs was encouraged in her efforts to lose weight and also to quit smoking and increase exercise. Tr. 407. The medical record does not indicate Riggs' obesity resulted in functional limitations and she did not assert any such limitations in her testimony. The ALJ noted Riggs was obese but had experienced a successful weight reduction of twenty percent. Tr. 19. Riggs also asserts the ALJ failed to properly consider obesity in combination with other impairments. "[An ALJ] will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. [The ALJ] will evaluate each case based on the information in the case record." *Burch v. Barnhart*, 400 F. 3d 676, 682 (9th Cir. 2005), citing SSR 02-01p. The ALJ correctly noted "no evidence of significant complications" from obesity and Riggs has not provided any evidence of such complications. Tr. 19. As the ALJ correctly noted, "the claimant's work history was during the period before weight

reduction." *Id.* The record indicates Riggs successfully worked during the time she was obese and treated for asthma, fibromyalgia, depression, diabetes, and gastrointestinal problems. Tr. 239-254, 272-273, 276, 279-280, 283-284, 378-379. The ALJ properly evaluated Riggs' obesity based on the information in the record.

## II.     Credibility Determination

Riggs asserts the ALJ inadequately assessed her credibility regarding her limitations. The ALJ must assess the credibility of the claimant regarding the severity of symptoms only if the claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms. *Smolen v. Chater*, 80 F.3d at 1281-1282. Riggs has medically determinable impairments which could produce some of her symptoms. When there is an underlying impairment and no evidence of malingering, an ALJ may discredit a claimant's testimony regarding the severity of symptoms only by providing clear and convincing reasons based on specific findings. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Smolen v. Chater*, 80 F.3d at 1283-1284.

The ALJ may consider objective medical evidence, the claimant's treatment history, aggravating factors, and any unexplained failure to seek treatment or follow a prescribed course of treatment. *Id.* at 1284. The ALJ specifically noted the medical record did not support Rigg's allegations. He noted Riggs' history of failure to comply with treatment recommendations and instructions. Riggs' was advised physical therapy was important for her fibromyalgia symptoms, yet she was discharged from physical therapy for failure to attend sessions and reschedule appointments. Tr. 685-688. She was referred to Dr. Pathiel for evaluation of sleep apnea to determine the cause of her sleep problems and fatigue. Tr. 468, 725-726. However, Riggs left

13 - FINDINGS AND RECOMMENDATION

during the evaluation and there is no record of further testing. Tr. 372. Riggs also stopped taking her medications, and at times had to be redirected to resume her medications. Tr. 454,756, 806. The ALJ also noted she reported stress and "panic attack" symptoms during periods of personal and family problems. Tr. 22. However, Riggs has a history of refusing mental health referrals and mental health treatment other than medication. Tr. 435, 472, 754.

In determining credibility, the ALJ may consider the claimant's daily activities, work record and the observations of physicians and third parties with personal knowledge about the claimant's functional limitations. *Smolen v. Chater,* 80 F.3d at 1284. In addition, the ALJ may use ordinary techniques of credibility evaluation, such as prior inconsistent statements concerning the symptoms, or other actions which reflect on the claimant's credibility. *Id;* SSR 96-7p. The ALJ noted inconsistencies between Riggs' alleged level of limitations and her activities. She reported episodes of increased pain and discomfort following exertions such as hiking, berry picking, and walking at the state fair. Tr. 422, 427, 689, 1050. Drs. James and Morrell remarked on the inconsistency between her complaints of pain and clinical observations of her behavior and movement. Tr. 504-508, 867. Dr. James' clinical notes recount Riggs became adversarial because he would not change his statements regarding her level of disability in a letter requesting assistance from the Social Services Division of the Confederated Tribes of the Grand Ronde. A letter written by the nurse was instead substituted. Tr. 24, 867. The ALJ also noted her insistence on a second opinion when her treating physician, Dr. Cassim, released her for regular work following a hernia repair. He further noted her failure to complete a mental health jobs assessment program. Tr. 23. The ALJ gave clear and convincing reasons for finding Riggs not credible regarding her limitations.

/ / / / /

### III.  Lay Witnesses

Riggs contends the ALJ should have incorporated the observations of lay witnesses into her RFC. " Friends, family members, and others in a position to observe a claimant's symptoms and daily activities are competent to testify as to the claimant's condition." *Dodrill v. Shalala*, 12 F.3d 915, 918-919 (9th Cir. 1993). Such testimony cannot be disregarded without comment. *Nguyen v. Chater*, 100 F3d 1462, 1467 (9th Cir. 1996). If the ALJ wishes to discount lay witness testimony, he must give reasons that are germane to the witness. *Id.* Inconsistency with medical evidence is one such reason. *Lewis v. Apfel,* 236 F.3d 503, 511 (9th Cir.2001).

The ALJ reviewed the statements from the lay witnesses in his opinion and acknowledged, "some information which is supportive of the claimant's allegations." Tr. 21. He found the testimony reflected "behavior they have seen and what they have been told" including limitations from medical procedures not in the medical record. Tr. 22. The ALJ also listed contradictory information in the reports of daily activities submitted by Kenneth Cram, Riggs' former spouse, and Shirley Marrs, Riggs' mother. The ALJ also recounted the testimony of Orvetta Reed, Valerie Komes, Patricia Melton and Lisa McColly. However, he also noted the testimony was inconsistent with the medical record. He listed the witnesses' conclusions that Riggs is unable to work, however, each witness described different symptoms as the reason. Tr. 22. It is the ALJ's role to assess conflicting evidence and resolve it. *Edlund v. Massanari,* 253 F.3d at 1156; *Thomas v.Barnhart,* 278 F.3d 947, 957 (9th Cir. 2002). The ALJ assessed the lay witnesses' testimony and gave sufficient

/ / / / /

/ / / / /

/ / / / /

15 - FINDINGS AND RECOMMENDATION

reasons for rejecting the conclusions therein.

## **RECOMMENDATION**

Based on the foregoing findings and conclusions, the Commissioner's final decision should be affirmed.

## **SCHEDULING ORDER**

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due **January 18, 2007**. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

DATED this 28th day of December, 2006.

     /s/ Donald C. Ashmanskas
DONALD C. ASHMANSKAS
United States Magistrate Judge